```
               UNITED STATES DISTRICT COURT
                  DISTRICT OF MINNESOTA
                 Civil No. 08-417(DSD/JJK)
```

Owatonna Clinic-Mayo Health
System,

       Plaintiff,

v.  **AMENDED ORDER**

The Medical Protective Company
of Fort Wayne, Indiana,

       Defendant.

    William R. Stoeri, Esq., H. Alex Iliff, Esq., Katie C. Pfeifer, Esq. and Dorsey & Whitney, 50 South Sixth Street, Suite 1500, Minneapolis, MN 55402, counsel for plaintiff.

    Richard P. Mahoney, Esq., Victor E. Lund, Esq. and Mahoney, Dougherty and Mahoney, 801 Park Avenue, Minneapolis, MN 55404 and James K. Horstman, Esq. and Cray, Huber, Horstman, Heil & VanAusdal, 303 West Madison, Suite 2200, Chicago, IL 60606, counsel for defendant.

This matter is before the court on the parties' separate motions for summary judgment. Based upon a review of the file, record and proceedings herein, and for the reasons stated, the court denies the parties' motions.

# BACKGROUND

This insurance coverage dispute arises out of a "claims-made" insurance policy ("Policy") between plaintiff insured Owatonna Clinic-Mayo Health System ("Owatonna Clinic") and defendant insurer The Medical Protective Company of Fort Wayne, Indiana ("Medical

Protective"). The Policy provided Owatonna Clinic with up to $2 million in coverage for "any claim for damages" filed between January 1, 1999, and January 1, 2000. (Pfeifer Decl. Ex. B.) An amendatory endorsement to the Policy ("amendatory endorsement") defined a "claim filed" as

> the receipt, by [Medical Protective] during the term of the policy, of written notice of a medical incident from which [Owatonna Clinic] reasonably believes allegations of liability may result. In order to be deemed a claim, notice of a medical incident shall include all reasonably obtainable information with respect to the time, place, and circumstances of the professional services from which liability may result and the nature and the extent of the injury, including the names and addresses of the injured and of available witnesses.

(Id.)

A June 7, 1999, letter to Owatonna Clinic obstetrics and gynecology doctor Charles E. Chambers, M.D. ("Chambers") included a Notice of Conference ("Notice") indicating that the Complaint Review Committee ("Committee") of the Minnesota Board of Medical Practice ("Board") had scheduled a conference for July 8, 1999, to discuss allegations related to his "ability to practice medicine and surgery with reasonable skill and safety to patients." (Pfeifer Decl. Ex. H at 1.) The Notice indicated that "Patient #5"[1] received an ultrasound on June 11, 1998, at approximately

---

[1] The Notice contained allegations related to five patients who were referred to by number to protect their identities. The letter to Dr. Chambers, however, identified the patients' names or
(continued...)

thirty-five weeks gestation that Chambers read as showing polyhydramnios. The patient was admitted on June 30, 1998, for induction and later gave birth to an infant that had "persistent respiratory distress, and a chest x-ray showed a diaphragmatic hernia, which had not been noted in [Chambers'] ultrasound report." (Id. at 6-7.) The Notice stated that the "Committee's consultant opined that it is a deviation from accepted OB ultrasound standards of care to evaluate a patient for polyhydramnios and miss a diaphragmatic hernia." (Id. at 7.)

Chambers gave the Notice to Owatonna Clinic's chief administrative officer, David Berg ("Berg"), who learned that the Committee's investigation arose from the mandatory reporting of a 1998 settlement between Owatonna Clinic, Chambers and one of the patients mentioned in the Notice. (Berg Dep. at 82-83.) In response, Berg gave a copy of the Notice to Medical Protective regional manager, John Wasche ("Wasche"). Berg also allegedly told Wasche that he "believed a claim could come from those cases identified and those patients identified in [the Notice]," and that they needed to "manage the risk [and] be aware of a potential claim." (Id. at 13-14, 39.)

Medical Protective retained an attorney to represent Chambers before the Committee pursuant to Chambers' independent insurance

---

[1](...continued)
record numbers.

3

policy with Medical Protective that was paid for and managed by Owatonna Clinic. (Pfeifer Decl. Ex. J; Chambers Dep. at 24-25, 44-45.) By the time Chambers prepared his response to the Notice, he had learned that Patient #5 was Jodi Schroeder Huisman ("Schroeder") and had reviewed her records. (Chambers Dep. at 51.) Chambers, through counsel, responded to the Notice on June 28, 1999, denying "that his reading of the ultrasound on June 11, 1998, constituted a departure from the applicable standard of care." (Pfeifer Decl. Ex. L.) On March 11, 2000, however, the Committee and Chambers stipulated that Chambers deviated from the standard of care by failing "to identify a diaphragmatic hernia while evaluating [Schroeder] for polyhydramnios." (Pfeifer Decl. Ex. P ¶ 3(r).) The stipulation permitted the Board to use its factual statements in "any further proceedings before the [Board], but for no other purposes including, but not limited to, in any civil litigation." (Id. ¶ 3.) Medical Protective received a copy of the stipulation.

Chambers' employment at Owatonna Clinic ended in November 1999. (Chambers Dep. at 16.) Thereafter, Owatonna Clinic purchased an extended reporting period insurance endorsement ("extended reporting endorsement") from Medical Protective on behalf of Chambers. To obtain the endorsement, Berg sent a letter to Medical Protective on August 2, 2001, stating that:

> To the best of my knowledge I am not aware of any occurrences having potential for a claim

4

> arising out of the rendering or failing to render professional services including all cases with adverse results from the period of August 19, 1994 to November 1999. I also do not have knowledge of any claims, potential claims or suits [in] which Owatonna Clinic may become involved including without limitation knowledge of any alleged injury arising out of the rendering or failing to render professional services which may give rise to a claim during the above specified period.

(Horstman Aff. Ex. 10.) Chambers provided a similar letter on his own behalf. (Chambers Dep. Ex. 17.)

After communicating with an attorney representing Schroeder and her son C.H., in-house counsel for Mayo Clinic,[2] Joshua Murphy ("Murphy"), wrote to Medical Protective on April 20, 2005, notifying it of a potential claim against Chambers related to "the prenatal care and birth of [C.H.] who was born on June 30, 1998."[3] (Murphy Aff. Ex. 1.) Murphy sent the letter solely on behalf of Chambers because at that time he did not believe Owatonna Clinic would be sued. (Murphy Dep. at 30-31.)

On June 13, 2005, Schroeder filed a lawsuit on behalf of C.H. in Minnesota state court, alleging negligence claims against Chambers and Owatonna Clinic related to the June 11, 1998,

---

[2] Mayo Clinic provided legal services to Owatonna Clinic because it is part of the Mayo Health System. (Murphy Aff. ¶ 3.)

[3] C.H. was eventually diagnosed with cerebral palsy and other neurological problems.

5

ultrasound ("C.H. lawsuit").[4]  (Murphy Aff. Ex. 2.)  Murphy tendered the defense of the lawsuit to Medical Protective in a June 21, 2005, letter.  (Murphy Aff. Ex. 3.)  Medical Protective accepted the tender on behalf of Chambers pursuant to the extended reporting endorsement but denied the tender on behalf of Owatonna Clinic.  (Murphy Dep. at 38; Press Dep. 41-42.)  As a result, Owatonna Clinic's then-current insurer, Mayo Insurance, defended it in the C.H. lawsuit.  (Murphy Aff. ¶ 9.)  After substantial discovery and pretrial motions, Chambers and Owatonna Clinic settled the C.H. lawsuit on August 8, 2007, for $4.25 million.  (Id. ¶ 26.)  Mayo Insurance contributed $3.25 million on behalf of Owatonna Clinic and Medical Protective contributed $1 million on behalf of Chambers.  (Id.)

Owatonna Clinic brought this breach of contract action on February 15, 2008, alleging that Medical Protective breached the Policy by refusing to defend and indemnify it in the C.H. lawsuit. The parties' separate motions for summary judgment are now before the court.

---

[4] The complaint named additional defendants that are not relevant to this action.

**DISCUSSION**

**I.    Summary Judgment Standard**

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  A fact is material only when its resolution affects the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party.  See id. at 252.

On a motion for summary judgment, all evidence and inferences are to be viewed in a light most favorable to the nonmoving party. See id. at 255.  The nonmoving party, however, may not rest upon mere denials or allegations in the pleadings but must set forth specific facts sufficient to raise a genuine issue for trial.  See Celotex, 477 U.S. at 324.  Moreover, if a plaintiff cannot support each essential element of his claim, summary judgment must be granted because a complete failure of proof regarding an essential element necessarily renders all other facts immaterial.  Id. at 322-23.

## II. Breach of Contract

Owatonna Clinic argues that Minnesota law requires only substantial compliance with the notice content requirement in a claims-made insurance policy and that provision of the Notice to Medical Protective substantially complied with the amendatory endorsement. In contrast, Medical Protective maintains that strict compliance is required or, alternatively, that Owatonna Clinic did not substantially comply with the amendatory endorsement.

The parties agree that Minnesota law governs this diversity case. Important distinctions exist between claims-made and occurrence insurance policies. An occurrence policy "provides coverage if the insured conduct 'occurred within the term of the policy, even if the term has since expired.'" Winthrop & Weinstine, P.A. v. Travelers Cas. & Sur. Co., 993 F. Supp. 1248, 1254 (D. Minn. 1998) (quoting Esmailzadeh v. Johnson & Speakman, 869 F.2d 422, 424 (8th Cir. 1989)), aff'd, 187 F.3d 871 (8th Cir. 1999). Thus, notice timing requirements in an occurrence policy are not of central importance and will preclude coverage only if the insurer suffered prejudice as a result of late notice. See Hooper v. Zurich Am. Ins. Co., 552 N.W.2d 31, 36 (Minn. Ct. App. 1996) (citing Reliance Ins. Co. v. St. Paul Ins. Cos., 239 N.W.2d 922, 924-25 (Minn. 1976)). In contrast, coverage under a claims-made insurance policy "is provided if the insured conduct is 'discovered and brought to the insurer's attention during the term

of the policy.'" Winthrop & Weinstine, 993 F. Supp. at 1254 (quoting Esmailzadeh, 869 F.2d at 424). The notice timing requirement in a claims-made policy "defines the scope of coverage" and is a "basic term of the insurance contract." Id. As such, courts strictly enforce the temporal limitations in claims-made policies. See id. at 1255.

Here, however, the issue is not the timeliness of Owatonna Clinic's claim, but rather the substantive adequacy of the Notice. The Minnesota Supreme Court has not addressed whether an insured must strictly comply with the notice content requirement in a claims-made insurance policy. Therefore, as a federal court sitting in diversity, the court must "'ascertain from all the available data what the state law is and apply it.'" AIG Centennial Ins. Co. v. Fraley-Landers, 450 F.3d 761, 767 (8th Cir. 2006) (quoting West v. Am. Tel. & Tel. Co., 311 U.S. 223, 237 (1940)). Decisions of a state's intermediate appellate court are not binding on a federal diversity court, "but they are persuasive authority" to be followed "when they are the best evidence of what the state law is." Cont'l Cas. Co. v. Advance Terrazzo & Tile Co., 462 F.3d 1002, 1007 (8th Cir. 2006) (quotation omitted).

In St. Paul Fire & Marine Insurance Co. v. Metropolitan Urology, 537 N.W.2d 297, 298-300 (Minn. Ct. App. 1995), the court held that substantial compliance with the detailed notice content provisions in a claims-made insurance policy was adequate.

9

Specifically, the court stated that as long as the "partial or defective notice clearly gave the insurer sufficient information to conclude that the insured had presented a claim for arguable coverage," the insurer had a duty "to investigate the insured's claims and to provide the insured with a coverage position." Id. at 300 (quotations omitted). Similarly, the court in St. Paul Fire & Marine Insurance Co. v. Tinney, 920 F.2d 861, 863 (11th Cir. 1991), required only substantial compliance with the notice content requirement under a claims-made policy, holding that "[o]nce the insurer is put on notice that there has been an incident, together with the essential facts upon which liability of the insurer depends, a claim is made."

The court finds these cases persuasive. Requiring strict compliance with the notice timing provisions in claims-made policies "'allows the insurer to more accurately fix its reserves for future liabilities and compute premiums with greater certainty.'" Winthrop & Weinstine, 993 F. Supp. at 1254-55 (quoting Fed. Deposit Ins. Corp. v. St. Paul Fire & Marine Ins. Co., 993 F.2d 155, 158 (8th Cir. 1993)). Failure to strictly enforce such provisions would abrogate these benefits by creating the prospect of "open-ended tail coverage." See Nat'l Union Ins. Co. v. Holmes & Graven, 23 F. Supp. 2d 1057, 1072 (D. Minn. 1998). This concern, however, does not apply to the notice content requirements. Imperfect but adequate notice of an incident within

the policy period permits an insurer to investigate potential claims, make an initial coverage determination and set reserves and compute premiums accordingly. Therefore, the court determines that the Minnesota Supreme Court would adopt a substantial compliance standard to the notice content requirement in a claims-made insurance policy.

In this case, the Notice identified the time, place and circumstances of Chambers' services, noted that the infant was born with persistent respiratory distress and a diaphragmatic hernia and indicated that the Committee's consultant believed Chambers' actions deviated from the standard of care. The Notice did not specifically identify Schroeder, C.H. or potential witnesses, or detail the full nature and extent of C.H.'s injuries. Nevertheless, Medical Protective could have easily obtained such information upon a limited investigation. See Tinney, 920 F.2d at 863. Therefore, the court determines that the Notice substantially complied with the amendatory endorsement.

This, however, does not end the court's inquiry. In addition to the content requirements, the amendatory endorsement required Owatonna Clinic to "reasonably believe[] allegations of liability may result" from the medical incident. A "reasonable belief" in this context has an objective and subjective component. Cf. Empire Indem. Ins. Co. v. Allstate County Mut. Ins. Co., Civ. No. 3:06-1415, 2008 U.S. Dist. LEXIS 37764, at *22-23 (N.D. Tex. May 8,

2008) (majority of jurisdictions hold "reasonable belief" exclusion in automobile insurance requires subjective and objective inquiry). In other words, Owatonna Clinic must have actually believed allegations of liability would result from Chambers' services and such belief must have been objectively reasonable.

As an initial matter, the Notice alleged that Chambers' services deviated from the standard of care and identified the infant as being born with persistent respiratory distress and an undiagnosed diaphragmatic hernia. Moreover, the investigation leading to the Notice arose from an earlier settlement between Owatonna Clinic, Chambers and a patient. Based on this information, it was objectively reasonable for Owatonna Clinic to believe that allegations of liability related to the Notice would result.

Nevertheless, inconsistencies in the record create a fact issue as to Owatonna Clinic's subjective belief. Berg testified that at the time he tendered the Notice to Medical Protective he told Wasche that a claim could come from the cases identified in the Notice. This suggests that Owatonna Clinic actually believed the allegations against Chambers related to Schroeder and C.H. would eventually result in allegations of liability against it. Cf. Travelers Indem. Co. v. Bloomington Steel & Supply Co., 718 N.W.2d 888, 895-96 (Minn. 2006) (discussing imputation of knowledge from employees to company). In the August 2001 letter, however,

Berg disclaimed any such belief.[5] Moreover, although Murphy notified Medical Protective of a potential claim against Chambers in April 2005, he did not believe Owatonna Clinic would be sued. This evidence indicates that at no time before Owatonna Clinic was sued in June 2005 did it believe that the Notice's allegations against Chambers would result in allegations of liability against it. Therefore, the court determines that a fact issue remains as to Owatonna Clinic's subjective belief, and summary judgment is not warranted for either party.[6]

## CONCLUSION

Based on the above, **IT IS HEREBY ORDERED** that:

1. Medical Protective's motion for summary judgment [Doc. No. 28] is denied; and

2. Owatonna Clinic's motion for summary judgment [Doc. No. 33] is denied.

Dated: August 10, 2009

                                       s/David S. Doty
                                       David S. Doty, Judge
                                       United States District Court

---

[5] Berg testified that in the letter he intended to convey only that he was unaware of "any undisclosed claim or anything that had happened since Dr. Chambers had left Owatonna Clinic" in November 1999. (Berg. Dep. at 27.) A fact issue, however, remains as to the actual meaning of the letter.

[6] As a result, it is premature to address the reasonableness of Owatonna Clinic's settlement of the C.H. lawsuit.